**IN THE UNTIED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**


**BLUE CROSS, BLUE SHIELD OF
MISSISSIPPI A MUTUAL INSURANCE
COMPANY**                                                          **PLAINTIFF**


**V.**                                  **CIVIL ACTION NO. 3:13cv655-HTW-LRA**


**GOVERNOR PHIL BRYANT, in his
Capacity as Governor of the State of
Mississippi**                                                    **DEFENDANT**


---

**GOVERNOR PHYL BRYANT'S MEMORANDUM
IN OPPOSITION  TO PLAINTIFF'S PETITION
FOR TEMPORARY RESTRAINING ORDER**

---


Presented by:

Harold E. Pizzetta, III
Chief, Civil Litigation Division
Office of Attorney General
Post Office Box 220
Jackson, Mississippi 39205
Telephone:  (601) 359-3680
Facsimile: (601) 359-2003
hpizz@ago.state.ms.us

# TABLE OF CONTENTS

Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

I.    The dispute between BCBS and HMA has resulted in an
      emergency situation threatening to deny tens of thousands
      of Mississippians access to health care. . . . . . . . . . . . . . . . . . . . . . **4**

      A.    The removal of HMA from the BCBS network harms
            patients' immediate medical care and their general
            access to care. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

      B.    The removal of HMA from the BCBS network threatens
            the financial survivability of the HMA health care
            system. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

      C.    The removal of HMA from the BCBS network creates a
            real and imminent threat to access to care for hundreds
            of thousands of Mississippians. . . . . . . . . . . . . . . . . . . . . . . . . **9**

II.   The State responds to the denial of access to health care through
      the Governor's limited Executive Order. . . . . . . . . . . . . . . . . . . . . . **10**

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

I.    BCBS faces a heavy burden in seeking a temporary restraining
      order. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

II.   BCBS has not "clearly" established that the public interest and
      the balance of harms weigh in favor of the requested extra-
      ordinary injunctive relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**

      A.    The public interest will be unquestionably disserved by
            the injunction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**

      B.    The balance of the harms weighs heavily against the
            injunction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**

III.  BCBS cannot establish a likelihood of success on the merits. . . . . . **15**

      A.    The Eleventh Amendment deprives this Court of
            jurisdiction to review any claims based on alleged
            violations of state law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**

i

**B.**     **BCBS's substantive due process claims fail as a matter of law.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

     **1.**      **BCBS has not identified a constitutionally protected liberty or property interest of which it has been deprived.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

     **2.**      **The State's action does not "shock the conscious."** . . . . **19**

     **3.**      **The State's action is "rationally related" to the State's unquestionably important interests in health care and insurance regulation.** . . . . . . . . . . . . . . . **20**

**C.**     **BSBC's procedural due process argument fails as a matter of law.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

**D.**     **BCBS's equal protection argument fails as a matter of law.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**

**E.**     **BCBS's Contract Clause claim fails as a matter of law.** . . . . . . **31**

     **1.**      **The Contract Clause is irrelevant as it applies only to acts of the legislature and not executive branch officials.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **31**

     **2.**      **The terminated network contract: There can be constitutional impairment of a terminated contract.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**

     **3.**      **Requiring a new business arrangement: Contracts Clause does not limit a State's authority to regulate how an insurer conducts future business or even future contracts.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **34**

     **4.**      **Assuming the existence of a contract and impairment, the Contracts Clause yields to a State's exercise of police power, especially police power exercised in an emergency.** . . . . . . . . . . . . . . . . . . . . . . . . **36**

     **5.**      **Assuming the existence of a contract and impairment, the impairment is not unconstitutional as the insurance industry is highly regulated.** . . . . . . . . . . . **37**

**Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **40**

ii

## Overview

As reflected by the tone of Blue Cross Blue Shield's ("BCBS") complaint, BCBS and Health Management Associates, Inc. ("HMA") are locked in a bitter struggle that has escalated to the point of denying access to health care for tens of thousands of Mississippians who are ensured by BCBS.[1]  On September 1, 2013, BCBS exiled all ten of HMA's Mississippi's hospitals to "out-of-network" status.[2]  An "out-of-network" status effectively denies policy holders' access to the HMA health care system by greatly increasing the out-of-pocket costs, uncertainty, and administrative burden for policy holders.  During a Joint Legislative Committee hearing before the Mississippi Legislature on the crisis created by BCBS's decision, BCBS officials confirmed that the decision to severely limit BCBS policy holders' access to the HMA health care system was in retaliation for HMA's breach of contract lawsuit filed against BCBS in state court.  *See* Transcript of Testimony before Joint Legislative Committee ("Trans.") at 53, Ex. A. ("So, after HMA filed the lawsuit, then the decision was made that the contract would be terminated. Not before. It was after.")

BCBS's strategy uses the health care  of tens of thousands of Mississippians as a bargaining chip its dispute with HMA.  At the September 16 hearing before the Legislature,

---

[1]  The merits of the actual dispute between BCBS and HMA are not the subject of the State's action.  Instead, the State only seeks to restore access to care for thousands of persons on terms previously set by BCBS until the Department of Insurance can hold a hearing on the conduct of BCBS and HMA.

[2]  Those hospitals are  Natchez Community Hospital, Northwest Mississippi Regional Medical Center (Clarksdale), Biloxi Regional Medical Center, Madison River Oaks Medical Center (Canton), Gilmore Memorial Regional Medical Center (Amory), Tri-Lakes Medical Center (Batesville), Central Mississippi Medical Center (Jackson) ("CMMC"), Crossgates River Oaks Hospital (Brandon), River Oaks Hospital (Flowood), and Woman's Hospital (Flowood).

at which both BCBS and HMA officials testified, established that the HMA

health care system is a critical component of the state's health care network.  As the denial

of access to care rippled across the state, BCBS confirmed that its negotiation strategy has

been to offer to reinstate "**some** HMA hospitals if HMA would **permanently dismiss its**

**baseless lawsuit**."  BCBS, News Release, Oct. 14, 2013, Ex. F (emphasis supplied).  In the

same press release, BCBS confirmed the access to care crisis when it stated that at least four

of HMA's hospitals "provide a unique serve to their community."  *Id*.  BCBS's press release

implicitly acknowledged that they had violated, among other state laws, the Patient

Protection Act of 1995 which requires BCBS to have contracts with "providers of sufficient

number throughout the service area to assure reasonable access to care with minimum

inconvenience by plan enrollees."  Miss. Code Ann. § 83-41-409(b).  Under growing

pressure from the patients, physicians, and State and local officials, on October 21, BCBS

finally dropped a part of its ransom demand and reinstated four of the ten HMA hospitals.

*See* BCBS News Release, Oct. 21, 2013, Ex. G.[3]  BCBS continues to insist that the remaining

six hospitals – River Oaks, Crossgates River Oaks, CMMC, River Oaks Madison, Natchez

Community, and Biloxi Regional – will remain exiled to out-of-network status, thereby

effectively denying thousands of BCBS policy holders access to those health care facilities.

Courts have recognized that the "relationship" between insurance companies and

health care providers "stand[s] on a different footing from the rest" "in our society" because

of the public and state's interest in access to health care.  *Harper v. Healthsource New*

*Hampshire, Inc*., 674 A.2d 962, 966 (N.H. 1996).  "[T]he public interest and fundamental

---

[3]  In doing so, BCBS applauded its own, partial effort to resolve this crisis of its
own creation. *See* Press Release, Oct. 14, 2013, Ex. F.

2

fairness demand that a health maintenance organization's decision to terminate its relationship with a particular physician provider must comport with the covenant of good faith and fair dealing and **may not be made for a reason that is contrary to public policy**." *Id.* (emphasis supplied). The United States Supreme Court has recognized insurance as "a business to which the government has long had a special relation." *Cal. State Auto. Ins. Ass'n v. Maloney*, 341 U.S. 105, 109-10 (1951)(affirming constitutionality of statute requiring company to contractually insure poor risk drivers). "[T]he power of the state is broad enough to take over the whole business, leaving no part for private enterprise, [and] the state may therefore hold its hand on condition that local needs be serviced by the business." *Id.* More specifically, states "may fix insurance rates . . . [and] curtail drastically the area of free contract[.]" *Osborn v. Ozlin*, 310 U.S. 53, 65-66 (1940)(citations omitted). As in other states, Mississippi's laws regulating insurance companies are "liberally construed" to "prevent or correct evils growing out of the conduct of such business." *Mississippi Ins. Underwriting Ass'n v. Maenza*, 413 So. 2d 1384, 1388 (Miss. 1982); *see, e.g.,* Miss. Insur. Bulletin 2011-7(requiring insurance companies to submit rates for approval), Ex. E; Miss. Code Ann. § 83-9-5(dictating language to be included in insurance contracts);§ 83-41-409(b)(requiring managed care companies to contract with sufficient number of health care providers); § 83-41-417(requiring managed care companies permit health care providers to apply to their network). The leading insurance treatise has described the state's power as follows:

> A state has the unquestioned power to regulate insurance companies and the method of conducting that kind of business. The business of insurance is considered not to be merely a private right, but a matter of public concern--a franchise subject to regulation by the state for the public good.

19 John Alan Appleman & Jean Appleman, Insurance Law and Practice § 10321 (1982).

BCBS's termination of ten Mississippi hospitals in retaliation for litigation, its ransom demand of reinstatement for dismissal, its eventual acknowledgment that at least some of those hospitals provide unique services to their communities, its belated reinstatement of four hospitals, and its continued use of access to six hospitals as a bargaining chip has harmed, and will continue to harm, access to care for thousands of Mississippians.  The State of Mississippi, through an Executive Order issued by Governor Phil Bryant, has sought to temporarily address and stabilize the damage to access to health care.  Requiring BCBS to reinstate the entire HMA health care system, and requiring HMA to accept reinstatement, for no longer than the next sixty days as the Department of Insurance investigates possible violations of state insurance laws, serves the public interest and violates no federal constitutional provision.

## Factual Background

**I.**    **The dispute between BCBS and HMA has resulted in an emergency situation threatening to deny tens of thousands of Mississippians access to health care.**

As BCBS is by far the dominant health insurer in Mississippi,[4] tens of thousands of Mississippians who have purchased insurance policies from BCBS are now threatened with being denied access to ten HMA hospitals.  While this dispute has already had a profound statewide impact on access to health care, with each passing day more patients are harmed and the threat to the financial stability of ten Mississippi hospitals becomes greater.  Unless

---

[4] An independent analysis estimates that BCBS's market shares of 81%, 73%, and 57% in the State's large group, small group, and individual insurance markets outpacing their closest competitor by a wide margin.  *See* Executive Order 1327 at 1, Ex. B.

temporary and limited State action is undertaken, patients, doctors, hospitals, and communities will continue to be hurt and threatened with greater harm, including the possible closure of these hospitals.

On September 1, 2013, HMA's Mississippi health care system, comprised of ten hospitals, was exiled to "out-of-network" status by BCBS. *See* Complaint at ¶¶ 12, 15. It costs a patient more out-of-pocket money for medical care at an out-of-network hospital. As BCBS explains, treatment at an in-network hospital requires only a 20% coinsurance payment ("co-pay") and guarantees that the patient will not be financially responsible for additional expenses (no "balance billing"). *Id.* at ¶ 5. If a person insured by BCBS seeks treatment at an "out-of-network" hospital, the out-of-pocket copay could be as high as 40% and the patient may be "balanced billed." *See id.* ("the insured has a lower coinsurance payment if he/she obtains treatment from a Network provider"). As noted below, the extra financial burden, uncertainty, and administrative burden for treatment at an out-of-network hospital is a serious impediment to access to health care and actually results in less health care. The temporary and limited State action seeks to restore the HMA health care system to "in-network" status *as it existed August 31, 2013, and on the terms previously set by BCBS* for a period of time no greater than sixty days to permit the Department of Insurance to complete its investigation and conduct a full hearing on the conduct of BCBS and HMA pursuant to Mississippi state law.

The immediate and long-term impacts to patients, doctors, hospitals, communities and the State of excluding tens of thousands of BCBS enrollees from ten Mississippi hospitals are dire. Indicative of the statewide harm, on September 16, 2013, the Mississippi Legislature convened a rare joint legislative hearing comprised of both senators and

representatives to investigate the impact of BCBS's removal of HMA from the network. *See generally* Trans., Ex. A.  Chairman Gary Chism noted from the outset that this "a concern for the whole State of Mississippi because it spreads out all over the State." Trans. at 4.  The Joint Legislative Committee heard testimony from HMA and BCBS officials, several physicians, and the Department of Insurance.  As set forth in the testimony, BCBS removed ten hospitals from its network – five in the Jackson area (River Oaks, Woman's, Crossgates, CMMC, and River Oaks Madison), as well as hospitals in Amory, Clarksdale, Batesville, Natchez, and Biloxi.  Trans. at 9-10.  The removal of these ten hospitals from the BCBS network impacts tens of thousands of Mississippians, as BCBS is by far the dominant health insurer in Mississippi.  *See* Trans. at 11; Executive Order 1327 at 1, Ex. B.

**A.**    **The removal of HMA from the BCBS network harms patients' immediate medical care and their general access to care.**

> "As two of Mississippi's biggest heavyweights continue to throw haymakers at one another, the person most likely to get punched is not even in the fight. Namely, you."

Jeff Ayres, "How You Lose as HMA, Blue Cross Battle", *The Clarion-Ledger*, Oct. 19, 2013, at A1, Ex. C.  These "punches" that patients are currently taking include:

- As BCBS concedes, it costs a person insured by BCBS significantly **more money out-of-pocket** if he or she seeks treatment at a now out-of-network HMA hospital.  *See* Complaint at ¶ 5.  HMA informed the Legislature that being out of network means it is "so expensive to go to those [HMA] hospitals that patients can't afford to go there."  Trans. at 10.  The Chief Executive Officer at CMMC has testified: BCBS's "decision to put CMMC out of its network has had, and is having, a significant disruptive effect on access to health care in our service area."  Aff. of Charlotte Dupre at ¶ 3, Ex. J.  BCBS is actively informing its members via letter that service at HMA hospitals will be administratively burdensome and more expensive.  *See* Dupre Aff. at ¶ 3(H)(warning policy holders of, among other consequences, possible "$500 benefit reduction" upon admission to an HMA hospital).  As a group of State, county, and local officials explained, "[p]atients are confused and scared. There are many people who are not sure if they can see their longtime doctors

at their local hospitals." *See* Letter to Governor, Ex. D.

- Patients have **delayed seeking preventative health care** because of the financial cost and uncertainty of seeking treatment at an "out-of-network" hospital. *See* Testimony of Dr. Joe Bailey, Trans. at 33. Decreased access to preventative care because out-of-network costs makes overall health care costs rise and system demands increase as people wait until their illnesses are more advanced before seeking treatment and often resort to emergency room visits instead of preventative care. *See* Testimony of HMA Official, Trans. at 17-18; Affidavit of Jeff Bedford at ¶¶ 3 & 4, Ex. I (HMA hospitals have seen a 30-35% drop in patient volume since being forced out-of-network).

- Because CMMC remains "out-of-network," BCBS critical care patients are being diverted away from CMMC, resulting in an increase in **overwhelmed critical care units** at other metropolitan hospitals – even while CMMC's critical unit is under-utilized. *See* Dupre Aff. at ¶¶ 3(e) & 3(f).

- Patients are being **denied coverage by BCBS** for services rendered at HMA hospitals. For example, Dr. Shani Meck, an obstetrics and gynecology physician at River Oaks (an HMA hospital) testified before the Legislature that a pregnant patient came to River Oaks in her 20th week and in a "horrible medical condition." Trans. at 45. She was not stable enough for transfer and was treated at River Oaks. *Id.* BCBS is now refusing to cover her medical treatment. *Id.* Relatedly, BCBS is attempting to divert patients away from HMA hospitals "by refusing to timely respond to pre-certification requests" submitted by HMA. *See* Bedford Aff. at ¶ 4.

- Requiring hundreds of pregnant women to **transfer to in-network hospitals and/or doctors** is "interfering with doctor-patient relationships," according to physicians. Trans. at 40-41. For example, Dr. Meck's office is directly above River Oaks Hospital and 50% of her patients are BCBS. Trans. at 41. Because River Oaks is now excluded from the network, 50% of her patients cannot be seen in River Oaks. *Id.* Having those patients deliver at hospitals across town makes Dr. Meck less available in cases of emergencies. *Id.* at 41-42. As Drs. Chris Glick and Merk testified, BCBS is "interfering with doctor-patient relationships." Trans. at 30. "[T]he people that are getting caught in the middle are the patients and physicians." Trans. at 40-41.

- The State's **only inpatient Burn Center** is located at Central Mississippi Medical Center (CMMC) – an HMA hospital that is out-of-network. *See* Aff. of William V. Williams at ¶ 3., Ex. H; Executive Order at 2. BCBS's action limits the access of their policy holders to the Burn Center and, by undermining the financial stability of CMMC, threatens to deprive all Mississippians of the Burn Center. *See The Clarion Ledger* at 2, Ex. C;

Williams Aff. at ¶ 3; Dupre Aff. at ¶ 3(a) (CMCM receives 20% of its revenue from BCBS); Executive Order at 2.

- The developmental clinic for **high-risk newborn babies** at River Oaks Hospital remains out-of-network. Williams Aff. at ¶ 4. The importance of this clinic was the subject of extensive testimony during the legislative hearing by Dr. Chris Glick, the past president of the Mississippi Chapter of American Academy of Pediatrics. *See* Trans. at 20-21, 23-25.

- Should HMA hospitals close or reduce services because of the economic impact, the Jackson metropolitan area would see a **severe shortage of labor and delivery capacity**. Approximately eighty percent of the babies born in the Jackson area are born at an HMA hospital. Trans. at 29. If HMA's Jackson hospitals close, other Jackson hospitals will not have sufficient capacity to treat those excess patients. As Dr. Click testified: "If you want your wives and your daughters to labor in the hallway and deliver babies in the hallway of a hospital, let HMA get closed. That's what's going to happen. There's not room." Trans. at 20-21, 29. Dr. Meck confirmed: "the HMA hospital system delivers a larger amount of babies than St. Dominic and Baptist combined do right now" and other Jackson hospitals could not serve the patients in the absence of HMA hospitals. Trans. at 43-44. The harm to access to care will spread beyond BCBS's policy holders and impact many other persons seeking health care. As *The Clarion Ledger* reported, "[a]s other hospitals absorb these new patients, the thousands who don't use the HMA facilities will find delays in care and more crowded conditions." Ex. C at 2.

- BCBS's stated intention to reinstate Woman's hospital, but not the remaining three metropolitan hospitals which deliver babies (River Oaks, Madison River Oaks, and CMMC) does not ameliorate the access to care issue. The exclusion of River Oaks, Madison River Oaks, and CMMC removes 29 labor and delivery beds and 35 Neonatal Intensive Care Unit beds which combined delivered and cared for 2,822 babies in 2012 alone. *See* Williams Aff. at ¶ 5.

**B.    The removal of HMA from the BCBS network threatens the financial survivability of the HMA health care system.**

Exclusion from the BCBS network is undermining the financial stability of HMA hospitals. BCBS hopes to force HMA to dismiss its state court lawsuit by inflicting upon HMA a sufficient financial loss. *See* BCBS, News Release, Oct. 14, 2013, Ex. F. (BCBS will reinstate "some HMA hospitals if HMA would permanently dismiss its baseless lawsuit").

HMA has experienced a 30-35% decrease in patient volume since being exiled on September 1, 2013. *See* Bedford Aff. at ¶ 4. At this rate, HMA will lose $50-55 million over the next 12 months. *Id.* at ¶ 5. To put the matter into perspective, these hospitals' reimbursements from BCBS significantly exceed the total payments they receive through the entire State Medicaid program. *See id.* at ¶ 6. The reinstatement of four hospitals will "only marginally diminish[] the overall economic effect" because the four reinstated hospitals "only account for approximately 23% of total BCBS revenues" for HMA. *Id.* at ¶ 7.

Without reinstatement, the risk that at least some of the ten hospitals would close – and the associated catastrophic impact on access to health care -- is simply too great for the State to ignore and justifies the limited and temporary State action. As HMA informed the Legislature: "Those hospitals are going to close. That's not a threat. I'm just talking economics." Trans. at 10, 58. "These hospitals aren't going to exist anymore if Blue Cross is allowed to do what it's doing." Trans. at 62. Should all or some of the HMA hospitals close, BCBS policy holders and the thousands of other patients, physicians, and communities who depend on those HMA hospitals will be harmed. For instance, the elderly and the neediest who are served by Medicaid and Medicare will be required to find health care at other facilities. Individuals with travel difficulties may simply be unable to travel to neighboring towns for anything other than emergency treatment. In short, thousands of patients will lose health care if the ten HMA hospitals close their doors.

**C.    The removal of HMA from the BCBS network creates a real and imminent threat to access to care for hundreds of thousands Mississippians.**

The testimony before the Legislature is compelling. As the past president of the

Mississippi Chapter of American Academy of Pediatrics declared: "I fear for the well being not only of my tiny babies, but also for the health of this entire community and the State of Mississippi. Bad choices are being made today that will adversely affect the health of our community and our state for years to come." Trans. at 20-21, 30. The threat to Mississippians is profound and summarized in a letter to Governor Bryant signed by a group of mayors, senators, representatives, and county supervisors:

> Patients are confused and scared. There are many people who are not sure if they can see their longtime doctors at their local hospitals. Expectant mothers are bring told to go to other hospitals and are concerned their regular doctor won't be able to deliver their child. We understand from health care professionals that there are not enough beds for newborns in Metro Jackson without Woman's Hospital and River Oaks in the mix. This gets even more urgent for tiny babies born prematurely, because Blue Cross now does not include the cutting edge NICU at River Oaks in their network. We have received reports from hospitals that emergency room visits in Rankin County are down since the Blue Cross decision, so it would appear that people who are in need of emergency care are driving farther than required to get care. Obviously, there are real health risks at stake due to Blue Cross' decision.
>
> In addition, well over a thousand direct jobs are at risk just here at the Rankin County hospitals, much less the fact that Batesville, Amory and Clarksdale could lose their only hospital in town. The Rankin County hospitals have an annual payroll of over $70 million and the statewide payroll is over $344 million. The ten hospitals pay over $15 million in taxes. In addition, hundreds and hundreds of third parties provide all sorts of services to the hospitals and depend on that business. It's obvious that this Blue Cross decision is dangerous for patients, employees and our communities.

*See* October 10, 2013 Letter to Governor Bryant, Ex. D.

## II.   The State responds to the denial of access to health care through the Governor's limited Executive Order.

The State and Governor Bryant did not enter this frey lightly. The Governor met with BCBS CEO, Carol Pigott, shortly before the hospitals' exclusions took effect in an effort

to understand the impasse and explore possible solutions.  *See* Letter from Gov. Bryant to C. Pigot, Sept. 24, 2013, Ex. K.  Four weeks later, he wrote to Ms. Pigott and again asked her to consider the effects of the parties' dispute on patients. *Id*.  When BCBS failed to respond and the impasse dragged on another month, Governor Bryant determined that the emergency and his constitutional obligation to see that the State's laws are faithfully executed required immediate action.

The Governor's Executive Order recites many of the facts above, and additional facts not mentioned above, demonstrating that the current negotiating posture of BCBS and HMA which has exiled HMA's health care system to "out-of-network" status has resulted, and will continue to result, in a denial of access to health care to thousands of persons.  *See* Executive Order at 1-5, Ex. B.  To ensure that BCBS is complying with Mississippi law, and to protect the thousands of Mississippians who are being denied, or at risk of being denied, access to health care during this dispute, the State, through the Governor's Executive Order, has taken a limited and reasonable, but temporary, measure.

First, the Department of Insurance is directly to promptly complete its investigation of whether BCBS is in violation of state law, and conduct a hearing, and/or issue its report within the next 60 days.  *See* Executive Order at 5.

Second, the State is requiring that – until the Department of Insurance completes its work, but in no event longer than the next 60 days – BCBS shall place the HMA health care system of ten hospitals back "in network."  *See* Executive Order at 5.  The State has directed that the HMA health care system must be temporarily returned to the network on the terms: (1) previously offered by BCBS, (2) previously accepted by HMA, and (3) as those

terms were interpreted by BCBS.[5]  *Id*.

Third, it appears that as of October 14 or 21, 2013, BCBS no longer objects to reinstating four HMA hospitals even if HMA will not dismiss its state court lawsuit. Reinstatement was delayed by at least a week, seemingly as a result of the parties' continued distrust of one another.  As the Executive Order recites "the parties' apparent inability to resolve even this comparatively limited issue threatens to harm the patients of these four affected hospitals." *See* Executive Order at 3. Thus, the Executive Order requires HMA to accept BCBS's offer with respect to those four hospitals as a condition of the reinstatement of the other six.  *Id*. at 5.

The State's action to protect the access to medical care for tens of thousands of Mississippians is limited in scope, limited in time, and incorporates terms previously dictated and utilized by BCBS.  These important terms foreclose any argument that a preliminary injunction is necessary to protect the public interest or to protect BCBS from irreparable harm.  Further, the public interest – based on the access to care for thousands of Mississippians – weighs heavily against the issuance of the requested injunction.

## Argument

## I.    BCBS faces a heavy burden in seeking a temporary restraining order.

BCBS must "clearly" establish each of the four elements before an injunction may

---

[5]  Specifically, the Complaint sets forth that "[a]ll of the HMA hospitals were paid under the Payment Rules effective for all Blue Cross Network hospitals in the same category in Mississippi for 2013.  HMA accepted these payments for more than six months" prior to September 1, 2013.  Complaint at ¶ 10 (emphasis original); *see also* Complaint at ¶ 7 ("Every single Blue Cross Network hospital operates under the exact same Payment Rules as every other Blue Cross Network hospital in its category." (emphasis original)).

issue: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that threatened injury outweighs the threatened harm to the non-movant; and (4) that the injunction will not disserve the public interest. *Voting for Am., Inc. v. Steen*, 2013 WL 5493964, at *2 (5th Cir. 2013)(movant must "clearly" establish each element).  Granting an injunction is the "exception rather than the rule." *Mississippi Power & Light v. United Gas Pipe Line Co.*, 760 F.2d 618, 620 (5th Cir. 1985).  The Fifth Circuit has "cautioned repeatedly" that an injunction is an "extraordinary remedy" to be granted only if the party seeking it has "clearly carried the burden of persuasion" on all four elements. *PCI Transp., Inc. v. Forth Worth & Western R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005) (internal quotation omitted).

## II.    BCBS has not "clearly" establish that the public interest and the balance of harms weigh in favor of the requested extraordinary injunctive relief.

### A.    The public interest will be unquestionably disserved by the injunction.

BCBS must "clearly" establish that the injunction will not disserve the public interest. *Voting for Am.*, 2013 WL 5493964, at *2.  Here, the injunction would clearly harm the public.  It is unsurprising that federal courts find access to health care to be a matter of public interest and decline to issue injunctive relief that would harm access to health care. *See, e.g., Machlett Labs., Inc. v. Techny Indus., Inc.*, 665 F.2d 795, 798 (7th Cir. 1981)(reversing injunction; "the public interest in the low cost of health care is also disserved insofar as reduced competition would probably increase the price of mobile x-ray machines"); *Olympus Managed Health Care, Inc. v. Am. Housecall Physicians, Inc.*, 2009 WL 275779 (W.D.N.C. 2009)("the public interest weighs against enjoining Olympus as sought by AHP. Instead, the public interest lies in preventing the harm to Olympus that

would result from AHP's requested injunction, and in maximizing the availability of cost effective medical care to policyholders of Olympus' clients within the United States"); *cf. Mount Sinai Med. Ctr. of Greater Miami, Inc. v. City of Miami Beach*, 706 F. Supp. 1525, 1533 (S.D. Fla. 1989)(public interest served by injunction which kept hospital open). Temporarily placing BCBS and HMA back into the "in network" status of August 31, 2013, will reverse the growing denial of access to care that is harming thousands of patients, hospitals, and communities across the State.  It will also ensure the continuity of existing doctor-patient relationships, a matter of clear public interest. *See, e.g., Galper v. U.S. Shoe Corp.*, 815 F. Supp. 1037, 1044 (E.D. Mich. 1993) ("public policy favors" maintaining a doctor's ability to "service to local residents"); *Hagan v. Vision Serv. Plan*, 2005 WL 3447882, at *10-*11 (E.D. Mich. Dec. 15, 2005) (holding that "termination [of a provider agreement] would significantly disrupt the continuity of care provided to the many ... insureds who are patients of the [providers]" and thereby "harm ... the public").  This is truly a matter of statewide harm and concern.  Without limited State action, the health care of thousands will be impacted.  The requested injunction would harm access to care and be contrary to important, statewide public interest.

**B.**     **The balance of the harms weighs heavily against the injunction.**

BCBS cannot "clearly" establish that it will be irreparably harmed without the injunction and cannot clearly establish that the alleged irreparable injury to BCBS outweighs the threatened harm to the State of Mississippi and to tens of thousands of Mississippians.  There is little, if any harm to BCBS.  The State's limited-in-scope and limited-in-duration action requires only that BCBS and HMA to return to their respective

positions of August 31, 2013, for no more than the next 60 days, and under the terms, and the interpretation of those terms, advanced by BCBS.  As the Complaint recites, BCBS and HMA operated under these terms for "<u>for more than six months</u>" prior to September 1, 2013.  Complaint at ¶ 10 (emphasis original); *see also* Complaint at ¶ 7 ("<u>Every single Blue Cross Network hospital operates under the exact same Payment Rules as every other Blue Cross Network hospital in its category</u>." (emphasis original)).  By requiring HMA to be re-instituted on terms previously devised, accepted, and interpreted by BCBS, the State has taken all reasonable measures to ensure that BCBS is not irreparably harmed.

Further, the fact the BCBS has now informed this Court that its intention is to reinstate four of the ten hospitals into its network – under the same terms required by the Executive Order – further undermines any claim to irreparable harm.  Any claim of irreparable harm for those four hospitals is nonexistent given BCBS's offer.  Further, any claim of irreparable harm arising out of the reinstatement of the remaining six hospitals is nonexistent as those six will participate on the exact same terms under which BCBS has already reinstated the four hospitals.

In contrast, the harm to the State and its citizens if the injunction is issued will be great.  The access to care for thousands of Mississippians is at stake, along with the financial stability of ten hospitals.  Any harm to BCBS is greatly outweighed by the widespread harm to the citizens of Mississippi.

Without even considering BCBS's lack of likelihood of success on the merits, the injunction should be denied.

## III.    BCBS cannot establish a likelihood of success on the merits.

**A.     The Eleventh Amendment deprives this Court of jurisdiction to review any claims based on alleged violations of state law.**

BCBS supports much of its arguments with citations to Mississippi law, including its claim of an entitlement to a hearing by virtue of Mississippi Code Sections 83-41-404 and 83-5-39.  BCBS's interpretation of state law is wrong.  More importantly, the Eleventh Amendment bars claims against state officials based on state law.  As declared by the Supreme Court in *Pennhurst State School & Hospital v. Halderman*: "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment."  465 U.S. 89, 106 (1984). State law claims "are not cognizable . . . because state officials continue to be immunized from suit in federal court on alleged violations of state law." *Earles v. State Bd. of Certified Public Accountants*, 139 F.3d 1033, 1039 (5th Cir. 1998); *McLaughlin v. City of Canton, Miss.*, 947 F. Supp. 954, 964 (S.D. Miss. 1995)(applying *Pennhurst* to dismiss pendent state law claims)(Wingte, J.).  Indeed, the Eleventh Amendment not only bars direct state law claims against a state officials, it requires that in adjudicating the federal claims, a federal judge "must assume that the state officials' interpretation is right – not necessarily because it is correct . . . but because errors in the interpretation of state law do not supply a basis for federal relief. Constitutional adjudication tests the power of a state to act in a particular way; whether the state indeed wishes to act in that way is a question of its domestic law. The Constitution does not require states to administer their laws correctly." *Burgess v. Ryan*, 996 F.2d 180, 184 (7th Cir. 1993) (Easterbrook, J.).  Relief under state law must be sought in state court.  *Id.*

16

The Eleventh Amendment deprives this Court of jurisdiction to consider any argument that the Governor's action failed to comply with the procedures or substance of state law. The Eleventh Amendment requires a narrow focus: does the State's action violate a federal constitutional right.[6]

**B.     BCBS's substantive due process claims fail as a matter of law.**

      **1.     BCBS has not identified a constitutionally protected liberty or property interest of which it has been deprived.**

"The threshold requirement of any due process claim is the government's deprivation of a plaintiff's liberty or property interest." *DePree v. Saunders*, 588 F.3d 282, 289 (5th Cir. 2009). Without the deprivation of a protected property or liberty right, there is no due process claim and no need to progress further in the analysis. *See Shearer v. Bowen*, 216 F.3d 1080 (5th Cir. 2000)("Without a property interest, the Due Process Clause does not come into play.").

BCBS contends that it has been deprived of its "right to contract" which is allegedly a "liberty and property" interest protected by the Due Process clause. Pl. Mem. at 9-10. In support, BCBS cites *Pyeatte v. Bd. of Regents of Univ. of Okl.*, 102 F.Supp. 407 (W.D.Okla. 1951), which in turn cites two 19th-century cases. Pl. Mem. at 10. BCBS's authority is no longer good law on this point.[7] The Supreme Court has confirmed that the *Lochner* era

---

[6] BCBS does not challenge the entirety of the Executive Order but only Section 4 pertaining to network access. The remaining provisions – requiring the Department of Insurance to further investigate violations of state law – are clearly valid under state law. Further, they implicate no federal constitutional provision.

[7] It is telling that the most supportive case BCBS could unearth, *Pyeatte*, found that the right to contract was not "absolute" and the "State may validly limit or in some cases effectively prohibit contractual relations" as long as the action was not "unreasonable and arbitrary." 102 F. Supp. at 412.

cases recognizing a "right to contract" protected by Due Process have been overruled.  *See Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 861-62 (1992)(pl. op. "the interpretation of contractual freedom . . . rested on fundamentally    false factual assumptions"); 505 U.S. at 957 (Rehnquist, J. concurring, comparing "erroneous" cases finding a right to contract under the Due Process Clause with *Plessy v. Ferguson*).  It is now "clearly established that 'liberty' under the Due Process Clause does not protect 'freedom of contract.'" *Toussie v. County of Suffolk*, 806 F. Supp. 2d 558, 580 (E.D.N.Y. 2011)(citing *W. Coast Hotel Co. v. Parrish*, 300 U.S. 379, 391 (1937) ("The Constitution does not speak of freedom of contract.")); *Peoria Tazewell Pathology Grp., S.C. v. Messmore*, 2011 WL 4498937, at *7 (N.D. Ill. 2011) (the "Supreme Court no longer recognizes a substantive freedom-of-contract right")(citing *Planned Parenthood*); *see also Rebel Motor Freight, Inc. v. Ideal Chemical and Supply*, 1995 WL 606774, at *6 n. 7 (E.D. Ark. 1995)("[T]here is no fundamental right to contract free from government regulation guaranteed by the Constitution, . . . nor does the Constitution guarantee an individual the right 'to engage in a business or to conduct it as one pleases.'" (quoting *Nebbia v. New York*, 291 U.S. 502, 527-28 (1934)).

Without a protected property or liberty right, the Due Process Clause "does not come into play" and the Court need not consider whether the State's action "shocks the

conscious"or satisfies rational basis review.[8]   However, for thoroughness, both such standards are discussed below.

## 2.    The State's action does not "shock the conscious."

To state a substantive due process claim regarding alleged "executive abuse of power" requires conduct that "shocks the conscience," violates the "decencies of civilized conduct," or interferes with rights "implicit in the concept of ordered liberty."  *Brown v. Nationsbank Corp.*, 188 F.3d 579, 591 (5th Cir. 1999).  A legally or factually incorrect decision is woefully insufficient for a substantive due process claim.  *See O'Neal v. Cazes*, 2007 WL 2875998, at * 3 (5th Cir. 2007).  "'[O]nly the **most egregious official conduct** can be said to be arbitrary in the constitutional sense.'"*McClendon v. City of Columbia*, 305 F.3d 314, 325-326 (5th Cir. 2002)(en banc)(emphasis supplied)(quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).  Even arbitrary conduct, standing alone, is insufficient; the conduct must be sufficiently arbitrary as to "shock the conscience." *Marco Outdoor Adver., Inc. v. Reg'l Transit Auth.*,  489 F.3d 669, 673 n.3 (5th Cir. 2007); *see also Reynolds v. New Orleans City*, 2008 WL 853591, at * 5 (5th Cir. 2008) (unequal enforcement of mandatory evacuation laws, even if arbitrary, would not state a substantive due process claim).  The "due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998).

---

[8]  BCBS appears to have correctly abandoned its claim that the right to contact exists as a "fundamental" right triggering strict scrutiny.  Compliant at ¶ 42; Pls. Mem. at 13-15 (arguing rational basis analysis); *see Washington v. Glucksberg*, 521 U.S. 702, 719-720 (1997)(fundamental rights are on the order of Bill of Rights, right to marry, to have children, and to marital privacy").

Even a cursory review of the facts in light of BCBS's role in the highly regulated field of insurance demonstrates the futility of its arguments. In Mississippi, as in other states, insurance is highly regulated and insurance statutes are "liberally construed" to "prevent or correct evils growing out of the conduct of such business." *Mississippi Ins. Underwriting Ass'n*, 413 So. 2d at 1388; *Allstate Ins. Co. v. Kim*, 829 A.2d 611, 625 (2003)("the contract at issue is an insurance policy which, like the industry as a whole, is subject to extensive regulation by the State"). The insurance field is replete with statutes and regulatory requirements that insurers enter in to contracts with both insurers and preferred providers.[9] It simply cannot be credibly contended that the State's action of requiring BCBS to adhere to the statutory requirements which it accepted upon certification nonetheless "shocks the conscience," violates the "decencies of civilized conduct," or interferes with rights "implicit in the concept of ordered liberty."

3. **The State's action is "rationally related" to the State's unquestionably important interests in health care and insurance regulation.**

With respect to rational basis analysis, "governmental actions involving social and economic regulation that do not interfere with the exercise of fundamental rights . . . are presumed to be constitutionally valid." *Yur-Mar, L.L.C. v. Jefferson Parish Council*, 451

---

[9] *See, e.g.,* Miss. Code Ann. § 83-9-5(dictating language to be included in insurance contracts); Miss. Insur. Bulletin 2011-7(requiring insurance companies to submit rates for approval)(Ex. E); Miss. Code. Ann. § 83-41-409(b)(requiring insurance companies to contract with sufficient number of health care providers). Managed care providers are in many states allowed only with statutory authority due to the inevitable lack of freedom granted to plan enrollees to select the health care providers of their choosing. Moreover, many states have "willing provider laws" that mandate insurance companies enter into "network" provider status with such providers. Other states highly regulate preferred provider agreements including provisions regarding notice to providers and insureds as well as provisions regarding termination of providers.

Fed. App'x 397, 401 (5th Cir. 2011) (citations omitted).  Given that no fundamental right is at issue, "the applicable standard of review for . . . substantive due process claims is rational basis."  *Kamman Inc. v. City of Hewitt*, 31 Fed. App'x 159 (5th Cir. 2001) (citations omitted).  Under rational basis review, a court need only determine whether the challenged state action is "rationally related to a legitimate state interest." *Yur-Mar*, 451 Fed. App'x at 401 (internal quotation marks and citations omitted).

Before progressing to what would be a <u>proper</u> rational basis analysis, it is important to recognize BCBS's <u>improper</u> analysis. BCBS argues that the Executive Order has "nothing to do with access to health care" because– in BCBS's own, self-serving two-page "analysis" – the exclusion of ten hospitals from its network is not harming access to care.  Pl. Mem. at 13.  According to BCBS, the State's action cannot be "rationally related to a legitimate state interest" because there is no harm to access to care and, therefore, no need for the Executive Order.  *Id.*  BCBS's argument is <u>exactly</u> the approach rejected by the federal courts.

First, BCBS asks this Court to judge the wisdom of the action, *i.e.,* is it actually necessary.  Rational basis review does not authorize the federal judiciary to sit as a "superlegislature to judge the wisdom or desirability" of state action.  *FM Properties Operating Co. v. City of Austin*, 93 F.3d 167, 175 (5th Cir. 1996); *Anderson v. Winter*, 631 F.2d 1238, 1240-41 (5th Cir. 1980) ("[C]ourts will not strike down state laws regulating economic and social concerns merely because they may be unwise [or] improvident"); *Woods v. Holy Cross Hosp.*, 591 F.2d 1164, 1184 (5th Cir. 1979) ("state program can be both good and bad, or either, and still be rational" under equal protection and due process (Roney, J., concurring)).

Next, BCBS's argument requires the Court to resolve the alleged factual dispute over access to care, accept BCBS' factual statements as true, and find the State's recited facts to be false.  Pl. Mem. at 13-14.  Under rational basis review, this Court does not resolve such fact disputes.  Instead, "the regulation is accorded a strong presumption of validity and must be upheld ... if there is **any reasonably conceivable state of facts** that could provide a rational basis for [it]."  *Cornerstone Christian Sch. v. Univ. Interscholastic League*, 563 F.3d 127, 139 (5th Cir.2009)(emphasis supplied).  BCBS cannot possibly argue, and actually does not actually argue, that there is no "conceivable state of facts" supporting a rational basis for the State's action.  The facts set forth in the Executive Order are not only "conceivable," they are compelling.  Moreover, these facts are based on, among other tings, BCBS' own public statements, as well as the testimony of doctors whose patients are being and will continue to be severely affected by BCBS's actions.  That BCBS disputes those facts is irrelevant to rational basis.

BCBS invites the Court down the wrong analytical road because a proper rational basis inquiry is fatal to its claim.  Insurance regulations, in particular, are subject to rational basis review.  *See, e.g.*, *Vesta Fire Ins. Corp. v. State of Fla.*, 141 F.3d 1427, 1430 n. 5 (11th Cir. 1998) (stating that because insurance regulation "is economic, the legislation is presumed valid unless no rational basis exists for its enactment").  The United States Supreme Court has recognized when regulating insurance, the State's police powers are at their zenith because insurance is "a business to which the government has long had a special relation." *Cal. State Auto. Ins. Ass'n*, 341 U.S. at 109-110.  "[T]he power of the state is broad enough to take over the whole business, leaving no part for private enterprise, [and] the state may therefore hold its hand on condition that local needs be serviced by the

business." *Id.* at 110.  The State "may fix insurance rates . . . [and] curtail drastically the area of free contract[.]"  *Osborn*, 310 U.S. at 65-66 (citations omitted).

Directly on point in this matter, the Supreme Court has affirmed the constitutionality of state laws **which require insurance companies to enter into contracts** for services when the requirement is related to a legitimate state interest.  For example, in *Maloney*, the Supreme Court upheld on due process grounds a California regulation requiring automobile insurers to contract with drivers who are poor risks.  341 U.S. 110-11 ("We cannot say California went beyond permissible limits when it made the liability insurance business accept insurable risks which circumstances barred from insurance and hence from the highways[.]").  Similarly, in *Insurers' Action Council, Inc. v. Markman*, 490 F. Supp. 921 (D. Minn. 1980), *aff'd* 653 F.2d 344 (8th Cir. 1981), the court held that legislation forcing health carriers to offer major medical coverage was rationally related to a legitimate government interest.  *Id.* at 925 ("[T]here is a rational relationship between the major medical, state plan and mandatory coverage provisions and the social and financial hardships caused by high health care costs[.]").  Other courts have reached the same conclusion. *See Vesta Fire*, 141 F.3d at 1430 n. 5 (finding Florida did not lack a rational basis for passing legislation after Hurricane Andrew which prevented property insurers from cancelling and refusing to renew the vast majority of policies; summarily rejecting insurers substantive due process claim in a footnote); *Health Insurance Association of America v. Harnett*, 376 N.E.2d 1280, 1283 (N.Y. 1978)(law mandating maternity care coverage in health and accident policies comported with substantive due process); *Sheeran v. Nationwide Mut. Ins. Co., Inc.*, 404 A.2d 625, 631 (N.J. 1979)(upholding requirement that automobile insurers renew policies as "a reasonable regulation designed to meet the

23

public need for continued insurance with guaranteed renewals"). These cases stand for the proposition that States may compel insurers to enter into contracts as a condition of doing business without violating their right to substantive due process.

Finally, BCBS's argument that its due process rights were violated when the State required it to conduct business with HMA hospitals was rejected by the court in *CIGNA Healthplan of Louisiana, Inc. v. State, ex rel. Ieyoub*, 883 F. Supp. 94, 99-100 (M.D. La. 1995), aff'd, 82 F.3d 642 (5th Cir. 1996). Louisiana enacted a statute requiring insurance providers to contract with any and every hospital that would meet the insurer's basic terms – called an "Any Willing Provider" statute. The court rejected the insurance company's argument that such a mandatory contracting requirement violated due process. The Court held that the statute was "rationally related to the legitimate and asserted State purpose of assuring patient access to quality health care without restricting the freedom to choose one's provider." Id at 99-100.

The ruling in the *CIGNA Healthplan* case is hardly surprising. Numerous states, in addition to Louisiana and Mississippi, have some type of "Any Willing Provider" or "AWP" statutes. We are unaware of any decision holding that such a statute violates due process or any other constitutional right. In *Kentucky Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329 (2003), the Supreme Court considered Kentucky's AWP law and unanimously rejected the argument that it was preempted by ERISA, no justice suggested that there might be an underlying constitutional problem with the law. And, yet BCBS's argument would require the invalidation of every AWP law in the country. Moreover, Executive Order 1327 imposes a far more limited burden than even a typical AWP law. Whereas an AWP law requires an indefinite relationship with "any willing provider," Executive Order 1327 only requires

24

BCBS to continue to do business under contract terms that it voluntarily accepted for sixty days.[10]  Therefore, Executive Order 1327 is a valid exercise of state regulatory authority unless it turns out that every AWP law in the country is unconstitutional and that fact has simply escaped judicial notice.

In sum, it does not violate the constitutional guarantee of substantive due process for the State to require an health insurance company to conduct business with hospitals who provide health insurance.  Citizens buy health insurance; insurers pay for health care; hospitals provide health care.  The State's action is rationally related to the legitimate government interest of protecting access to health care and regulating insurance companies.

### C.    BSBC's procedural due process argument fails as a matter of law.

As with substantive due process, the "threshold requirement of any due process claim is the government's deprivation of a plaintiff's liberty or property interest." *DePree*, 588 F.3d at 289. Procedural due process protection is not triggered unless there exists a constitutionally protected property or liberty interest.  As argued above, there is no right to contact protected by the Due Process clause so BCBS so the Due Process clause in inapplicable.  *See Planned Parenthood*, 505 U.S. at 861-62, 957. However, assuming a protected interest of some type to exist, procedural due process was satisfied.

Again, BCBS starts on the wrong premise.  BCBS argues that state law, particularly Code Sections 83-41-405 and 83-5-39, require a hearing before the Department of

---

[10]    Mississippi's Patient Protection Act—specifically, § 83-41-40913(b)—can be viewed as a particularized type of AWP statute.  Insurers such as BCBS are not required to contract with "any willing provider" but only those that are necessary "to assure reasonable access to care with minimum inconvenience by plan enrollees."  *Id.* Executive Order 1327 simply enforces this requirement.

Insurance may act.  Pl. Mem. at 10-12.  Setting aside for a moment that the action here was taken by the Governor, BCBS's reliance on state law is misplaced for two reasons.  First, the Eleventh Amendment prohibits review of state law claims and, therefore, the Court must assume the State to have acted in conformity with state law.  *See Pennhurst,* 465 U.S. at 106; *Burgess*, 996 F.2d at 184.  Second, a failure to follow a state procedural requirement is irrelevant to a federal due process claim.  The "process which is due under the United States Constitution is that measured by the due process clause, not that called for by state regulations. Mere failure to accord the procedural protections called for by state law or regulation does not of itself amount to a denial of due process." *Giovanni v. Lynn*, 48 F.3d 908, 912-13 (5th Cir. 1995).

Applying federal due process law, BCBS' claim fails.  First, BCBS was given notice and opportunity to be heard before State officials during the September 16th joint legislative hearing.  "The essential elements of due process are notice and an opportunity to respond," and "informal procedures will suffice." *Soderstrum v. Town of Grand Isle*, 925 F.2d 135, 138 (5th Cir. 1991).  The joint legislative hearing held on September 16 featured testimony from BCBS as well as HMA and physicians describing the catastrophic impact that BCBS's acts are having and will have on the access to health care throughout the State.  *See generally*, Trans., Ex. A.

Second, even though BCBS had a notice and opportunity to be heard by the State prior to the Governor's order, there is no absolute right to a hearing prior to emergency state action.  "[W]here a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause." *Gilbert v. Homar*, 520 U.S. 924, 931 (1997) (collecting cases).  In *FDIC v.*

26

*Mallen*, 486 U.S. 230 (1988), the Supreme Court described the circumstances in which post-deprivation process is constitutionally permissible as follows: "An important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation." *Id.* at 240.  A post-deprivation hearing is more likely to satisfy due process when, as in this case, the pre-hearing action "is not initiated by self-interested private parties" but by state officials responsible for applying state law, *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 679 (1974) (upholding Puerto Rican officials pre-hearing seizure of a yacht allegedly being used to traffic drugs).

In the course of developing these general principles, the Court has upheld a number of government actions undertaken without a hearing in furtherance of an important public interest.  For example, the Court upheld the admittedly "drastic" but still temporary order appointing a conservator over a savings and loan association without a hearing based solely on an agency's allegations that the association "was conducting its affairs in an unlawful, unauthorized and unsafe manner . . and jeopardizing the interests of, its members, creditors and the public." *Fahey v. Mallonee*, 332 U.S. 245, 247, 253–54 (1947).  It has also upheld the Department of the Interior's authority to order the immediate cessation of a mining operation without a hearing based on the agency's determination that the operation has violated applicable laws or permit conditions and "creates an immediate danger to the health or safety of the public, or is causing, or can reasonably be expected to cause significant, imminent environmental harm." *See Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 298–303 (1981).  The Court has also cited

27

approvingly a Third Circuit decision that upheld the FAA's authority to suspend an airline and individual employees for sixty days pending a hearing based on the agency's determination that the law had been violated and its "opinion that an emergency requiring immediate action exists in respect to air safety in commerce." *Air East, Inc. v. NTSB*, 512 F.2d 1227, 123–32 (3rd Cir. 1975), cited in *Hodel*, 452 U.S. at 302.  In each of these cases—as in this case—a responsible government official issued a temporary order based on a reasonably specific statute enacted to protect the public interest and a determination that prompt action was necessary.

The State's action in this case likewise satisfies the *Mallen* standard.  First, there is a "substantial assurance that the deprivation," if any, "is not baseless or unwarranted" (*Mallen*, 486 U.S. at 240) because Executive Order 1327 applies a reasonably specific standard of state law requiring minimum access to care with minimum inconvenience. See *Hodel*, 452 U.S. at 302.  Moreover, some of the most significant facts underlying the temporary order—that the hospitals were initially excluded from the network as a litigation tactic, even though at least some of them provide unique services in their communities—have now been admitted by BCBS.  Other significant facts were adduced at a legislative hearing in which BCBS participated and had an opportunity to rebut the charges being made against it.  Finally, and critically, the temporary order was issued and reasons for it given by a responsible state official, not a self-interested private party. *Calero-Toledo*, 416 U.S at 679.  That the order was issued by the State's chief executive order in a matter that has been the subject of intense public scrutiny provides an additional measure of public accountability and a further check against a "baseless or unwarranted" deprivation.

28

Second, under Mallen, reasonable access to healthcare is a matter of "important government interest."[11]  The Mississippi Patient Protection Act confirms that "reasonable access to care with minimum inconvenience" is essential.  And, as recounted above, there is evidence tending to show that the hospitals' exclusion from the BCBS network threatens to, inter alia, interrupt doctor-patient relationships, delay important medical care, overburden other hospitals, and perhaps even lead to the closure of hospitals that are, in fact, necessary parts of an adequate provider network.

Further, the State's action is temporary and limited in scope: it will remain in effect for no longer than sixty days and merely requires BCBS to return six hospitals to its provider network on terms under which BCBS was voluntarily proceeding less than two months ago.  The Supreme Court "has emphasized that in determining what process is due, account must be taken of the length and finality of the deprivation[.]" Homar, 520 U.S. at 932.

Finally, the executive order provides that BCBS will have a hearing before the Department of Insurance at which BCBS will be entitled to present its case that its exclusion of ten hospitals from the network did not violate state law.  Thus, BCBS will be given a prompt, post-action hearing satisfying any due process concerns.  See Camuglia v. City of

---

[11]   Preserving reasonable access to health care is an important state interest: preserving reasonable access to health care.  *Cf. Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 300 (1981) ("Protection of the health and safety of the public is a paramount governmental interest which justifies summary administrative action.").  Indeed, the State's interest is even more compelling than the interests identified by the Supreme Court in cases where it has held that a pre-deprivation hearing was not required.  *See, e.g.*, *Mallen*, 486 U.S. at 240 (government's interest in maintaining public confidence in banking industry justified post-deprivation hearing for indicted bank executive); *Barry v. Barchi*, 443 U.S. 55 (1979) (threat to integrity of horse racing by suspended trainer excused lack of pre-deprivation process).

Albuquerque, 448 F.3d 1214, 1220 (10th Cir. 2006) ("In matters of public health and safety, the Supreme Court has long recognized that the government must act quickly. Quick action may turn out to be wrongful action, but due process requires only a postdeprivation opportunity to establish the error.") (citing North American Cold Storage Co. v. City of Chicago, 211 U.S. 306, 315 (1908)).

Given the short duration of the order, the important public interest it protects, and the availability of a prompt post-action hearing, procedural due process has been satisfied.

### D.    BCBS's equal protection argument fails as a matter of law.

BCBS's equal protection "class of one" argument is fatally underdeveloped.  Pl. Mem. at 18.  For a "class of one," a plaintiff must show that he or she "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *L&F Homes v. City of Gulfport*, 2013 WL 4017711, at *5-6 (5th Cir. 2013) (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).  The burden is squarely on BCBS to: (1) identify a "similarly situated" insurance company; (2) that was treated differently, and (3) for which there is no "rational basis for the difference in treatment."  *See Lindquist v. City of Pasadena*, 669 F.3d 225, 233-34 (5th Cir. 2012); *see also Bush v. City of Gulfport*, 454 Fed. Appx. 270, 280-81 (5th Cir. 2011) (despite plaintiffs' claims that mayor "singled them out for different treatment because of his personal animus against their business and his own economic motives," class-of-one claim failed because plaintiffs failed to show the existence of similarly situated business); *Vineyard Investments, LLC v. City of Madison*, 2011 WL 3911071, at *3 (5th Cir. 2011) ("class-of-one" claim failed because plaintiff failed to show it was similarly situated to others); *Jackson Court Cond.,*

*Inc. v. City of New Orleans*, 874 F.2d 1070, 1079-80 (5th Cir. 1989) (plaintiff failed to show alleged comparators were "similarly situated").

BCBS does not attempt to identify a "similarly situated" insurance company – *i.e.,* one with dominant market share that abruptly terminated ten hospitals in a single day as a litigation tactic – that was treated differently, and for which there is no "rational basis for the difference in treatment." However, even if BCBS could establish a class-of-one argument, the State action would need only satisfy the rational basis test (the third prong). *Lindquist*, 669 F.3d at 233-34.[12] As set forth above, the State's action of temporarily reinstating ten hospitals to the BCBS network bears a reasonable relationship to the legitimate government objection of protecting access to health care. The action easily meets the test of whether there is **"**any reasonably conceivable state of facts that could provide a rational basis for the classification."

### E.     BCBS's Contract Clause claim fails as a matter of law.

#### 1.     The Contract Clause is irrelevant as it applies only to acts of the legislature and not executive branch officials.

The Contract Clause of the United States Constitution provides that "no state shall … pass any … law impairing the obligation of contracts." U.S. Const. Art. I, § 10. Given the phrase "pass any … law," the "prohibition is aimed at the legislative power of the state, and not at the decisions of its courts, or the acts of administrative or executive boards or

---

[12] An economic regulation can single out specific individuals or entities without violating the Equal Protection Clause. *See Apache Bend Apartments, Ltd. v. IRS*, 964 F.2d 1556, 1564 (5th Cir. 1992) ("Under *Dukes*, legislative classifications which amount to 'the creation of a closed class by the singling out of . . . a named company,' [*Morey v. Doud*, 354 U.S. 457, 469 (1957)], can withstand scrutiny under the rational basis test").

officers, or the doings of corporations or individuals." *New Orleans Waterworks Co. v. Louisiana Sugar-Ref. Co.*, 125 U.S. 18, 30 (1888); *see also*

*Perano v. Township of Tilden*, 423 F. App'x 234, 239 (3d Cir. 2011) (Contract Clause claim "must rest on an exercise of legislative power, not the acts of administrative or executive boards or officers;" dismissing claim based on executive enforcement of ordinances); *Frazier v. Lowndes Cnty., Miss., Bd. of Educ.*, 710 F.2d 1097, 1099 (5th Cir. 1983)("That clause applies to impairments through the exercise of legislative, not judicial authority."); *Smith v. Sorensen,* 748 F.2d 427, 436-37 (8th Cir. 1984) (quoting *New Orleans Waterworks*; concluding that "[r]ecent United States Supreme Court cases interpreting the contract clause have not dispensed with the necessity of establishing that the contract at issue was impaired by an act of legislative power"; and therefore holding that state officials' "administrative acts" applying state laws to "particular cases" did not implicate the Contract Clause); *AGI-Bluff Manor, Inc. v. Reagen*, 713 F. Supp. 1535, 1552 (W.D. Mo. 1989)("section applies only to state, not federal, legislation"); *Ass'n of Residential Res. in Minnesota (ARRM) v. Minnesota Comm'r of Human Servs.*, 2004 WL 2066822 (D. Minn. 2004)(same); *accord Pa. Workers' Compensation Judges Prof'l Ass'n v. Executive Bd. of Com.*, 39 A.3d 486, 494–96 (Pa. Cmwlth. Ct. 2012)(collecting federal cases holding that executive action did not implicate the Contract Clause). The Contract Clause is inapplicable to the Governor's Executive Order.

> **2. The terminated network contract: There can be no constitutional impairment of a terminated contract.**

BCBS asserts that there is a three-part inquiry under the Contract Clause. D Pl. Mem. at 15. In fact, it is a four-part test. First, there must be a valid and existing contract.

Second, State's action must "impair" that existing contract.  Third, the impairment must be substantial. Fourth, the impairment is constitutional if it is "reasonable and necessary to serve an important public purpose." *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983).  BCBS cannot satisfy the first part: there is no existing contract that is being allegedly impaired.

The Contract Clause limits the State's ability to impair ***existing*** contracts through legislation unless certain conditions are met.  *See U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1, 17 (1977) (even if a contract exists, "States must possess broad power to adopt general regulatory measures without being concerned that private contracts will be impaired, or even destroyed, as a result. Otherwise, one would be able to obtain immunity from the state regulation by making private contractual arrangements.").  A contract that has been terminated cannot be unconstitutionally impaired.  And, the Contract Clause does not limit State's authority to direct the terms of future contracts or interactions between two parties, even if those parties had a previous contractual relationship or will have a contractual relationship in the future.

The only contract BCBS identifies as the basis for its Contract Clause claim is its previously terminated Network provider agreements with the ten HMA hospitals.  Pl. Mem. at 16.  As BCBS stresses, those contracts had been terminated for "**fifty-two days**" before the Executive Order.  *Id.* (emphasis original).  Here, BCBS fails the first test of the Contract Clause: there must be an existing contract to be impaired.  "[N]o contracts clause violation is possible" when the contract at issue has "expired."  *Univ. of Hawaii Prof'l Assembly v. Cayetano*, 125 F. Supp. 2d 1237, 1242 (D. Haw. 2000).  "The contracts clause is only implicated when an *existing* contract is substantially impaired."  *Id.* (emphasis original);

33

*Bricklayers Union Local 21 v. Edgar*, 922 F. Supp. 100, 105 (N.D. Ill. 1996) (finding no impairment claim when contracts had expired as "Contract Clause is only implicated when an existing contract is substantially impaired"; citing *U.S. Trust Co. of New York*).  BCBS's contract clause argument ends here.

**3.**   **Requiring a new business arrangement:  Contracts Clause does not limit a State's how an authority to regulate an insurer conducts future business or even future contracts.**

At best, the State is requiring BCBS to enter into a new, but temporary, relationship with HMA.  BCBS argues that since it had previously terminated its contracts with the HMA hospitals, the Contract Clause prohibits the State from requiring BCBS to have a new business relationship with HMA.  That proposition is demonstratively false.  The Contracts Clause "does not apply to limit the ability of state and local governments to regulate the terms of future contracts; its scope only covers government interference with already existing contracts." *Montague v. Dixie Nat. Life Ins. Co.*, 2011 WL 2294146 (D.S.C. 2011). The states and the federal government routinely dictate requirements for new insurance contracts.  For example, the Affordable Care Act now prohibits insurers from denying coverage to persons based on preexisting conditions.  *See* 75 Fed. Reg. 37,190 (2010).  The Affordable Care Act also now prohibits insurers from imposing lifetime or annual limits on coverage.  *Id*.  Under BCBS's theory, if BCBS previously terminated a contract with an insured based on a pre-existing condition or lifetime limit, the Contract Clause would insulate it from any regulation requiring it offer a new contract to that individual.  However, "claims regarding future contracts do not state a claim since the Contract Clause does not apply to laws with prospective effect." *Bricklayers Union Local 21*, 922 F. Supp. at 105; *Montague*, 2011 WL 2294146 (Contract Clause "does not apply to limit the ability of state

34

and local governments to regulate the terms of future contracts"); *see also Golden Rule Ins. Co. v. Stephens*, 912 F. Supp. 261, 267 (E.D. Ky. 1995) (requiring new terms in a renewed insurance contract not implicate Contract Clause because each renewal is, in effect, a new contract).

BCBS is actually arguing that the State cannot force it to enter into a business arrangement against its will. That is not a Contracts Clause argument. As other federal courts have explained:

> Plaintiff argues that the provision under Act 1177 prohibiting insurers from refusing to write or renew automobile insurance policies for any insurable applicant violates the Contracts Clause of the United States Constitution. This contention is without merit. The Contracts Clause prohibits only significant legislative alterations of existing obligations, not the prospective requirement that automobile insurers accept eligible risks. A state may permissibly condition the privilege of doing business on the requirement that private industry service local needs as they are defined by the Legislature.

*Prudential Prop. & Cas. Co. v. Ins. Comm'n of S. Carolina Dep't of Ins.*, 534 F. Supp. 571, 581 (D.S.C. 1982); *see also Insurers' Action Council, Inc. v. Markman*, 490 F. Supp. 921, 930-31 (D. Minn. 1980)(requiring insurance company to offer new coverage when renewing contract does not violate Contract Clause because the "clause prohibits only significant legislative alterations of existing obligations").

Instead, BCBS's argument that the State may not "command insurers to enter into contracts and to incur liabilities against their will" is analyzed (and rejected) under the Due Process Clause. *See California State Auto. Ass'n Inter-Ins. Bureau*, 341 U.S. at 108 (finding that State requirement that insurers write policies for high risk drivers was not unconstitutional State action); *Peoria Tazewell Pathology Grp., S.C. v. Messmore*, 2011 WL 4498937 (N.D. Ill. 2011) ("Supreme Court no longer recognizes a substantive

freedom-of-contract right"; citing *Planned Parenthood*).  BCBS's attempt to resurrect the long dead "freedom of contract" concept through the Contract Clause will not work.

> **4.  Assuming the existence of a contract and impairment, the Contracts Clause yields to a State's exercise of police power, especially police power exercised in an emergency**.

It is without question that the "regulation of insurance is within the state's police power." *Firemen's Ins. Co. of Washington, D. C. v. Washington*, 483 F.2d 1323, 1328 (D.C. Cir. 1973).  A State's police power "is not limited to health, morals and safety"; rather, it "extends to economic needs as well." *Veix v. Sixth Ward Building & Loan Ass'n of Newark*, 310 U.S. 32, 38–39 (1940).  As the modern-day Supreme Court has recognized, "[i]t is to be accepted as a commonplace that the Contracts Clause does not operate to obliterate the police power of the States." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 503 (1987)(quoting *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 445, 54 S.Ct. 231, 78 L.Ed. 413 (1934)).

Critically relevant here is that the State is using its police power to regulate an insurer in order to avert a real and eminent emergency which threatens tens of thousands of citizens' access to health care and which may force the closure of ten hospitals.  As the Supreme Court's Contract Clause analysis recognizes that "[w]hile emergency does not create power, emergency may furnish the occasion for the exercise of power." *Home Bldg. & Loan Ass'n*, 290 U.S. at 426.  The *Home Blg. & Loan Ass'n* court upheld against a Contract Clause attack a statute temporarily restricting the authority to foreclose on mortgages. Although the legislation conflicted directly with lenders' contractual foreclosure rights, the Court acknowledged that, despite the Contract Clause, the States retain residual authority to enact laws "to safeguard the vital interests of [their] people." *Id.* at 434.  The

Court found five factors significant:(1) the state had declared that an emergency need for the protection of homeowners existed; (2) the state law was enacted to protect a basic societal interest, not a favored group; (3) the relief was appropriately tailored to the emergency; (4) the conditions were reasonable; and (5) the legislation was limited to the duration of the emergency. *Id.* at 444-447.  These factors remain the law.[13]

Particularly instructive is the Eleventh Circuit's case of *Vesta Fire Ins. Corp. v. State of Fla.*, 141 F.3d 1427 (11th Cir. 1998).  After Hurricane Andrew, home owners faced cancellation of their policies as insurance companies sought to leave the Florida market. *Id.* at 1429.  The Florida legislature enacted a "Moratorium Statute," "which prohibited the nonrenewal and cancellation of residential line insurance policies for reasons related to the risk of hurricane damage." *Id.*  The Eleventh Circuit found that, even if existing insurance contracts were impaired, the impairment was not unconstitutional because the State has "a legitimate public purpose: protection and stabilization of the Florida economy, particularly the real estate market." *Id.* at 1434 (citing *Home Building & Loan Ass'n*).  As stated above, the State's limited-in-scope and limited-in-duration action to remedy a widespread threat to access to health care and to financially stabilize ten hospitals is responsive to existing and dire situation. *See generally* Executive Order, Ex. B.  Following the Supreme Court in *Home Building* and the Eleventh Circuit in *Vesta Fire Ins. Corp.*, BCBS's Contract Clause claim has no merit.

---

[13]  *See United Auto., Aerospace, Agr. Implement Workers v. Fortuno*, 633 F.3d 37, 46 (1st Cir. 2011) (applying *Home Building* factors and dismissing Contract Clause claim); *Chrysler Corp. v. Kolosso Auto Sales, Inc.*, 148 F.3d 892, 896 (7th Cir. 1998)("Even big, totally unpredictable impairments of the obligation of contracts can survive challenge under the contracts clause if they are responsive to economic emergencies and even to considerably less exigent needs.")

5.    **Assuming the existence of a contract and impairment, the impairment is not unconstitutional as the insurance industry is highly regulated.**

"In determining the extent of the impairment, we are to consider whether the industry the complaining party has entered has been regulated in the past." *Energy Reserves Grp., Inc.*, 459 U.S. at 411.  "[T]his inquiry is whether the subject matter of the contracts has been subject to regulation at the time the contracts were made." *Lipscomb v. Columbus Mun. Separate School Dist.*, 269 F.3d 494, 504 (5th Cir. 2001).  If the subject matter of the contract was subject to regulation at the time the contracts were made, further regulation was foreseeable and there is no substantial impairment of the contract.  *Energy Reserves Group, Inc.*, 459 U.S. at 416 (no substantial impairment when "regulation existed and was foreseeable as the type of law that would alter contract obligations"); *Veix*, 310 U.S. at 38 (when one enters a market "already regulated in the particular to which he now objects, [one] purchases subject to further legislation upon the same topic").

The Supreme Court has confirmed that states "may fix insurance rates . . . [and] curtail drastically the area of free contract[.]"  *Osborn*, 310 U.S. at 65-66 (citations omitted).   Because the insurance industry is heavily and thoroughly regulated by States, Contract Clause claims generally fail as a matter of law.  *See, e.g., Campanelli v. Allstate Life Ins. Co.*, 322 F.3d 1086, 1098-99 (9th Cir. 2003) ("Given the highly-regulated nature of the California insurance industry and the statutory underpinnings of the contractual limitations clause, § 340.9's interference with contracts, while substantial, is not so severe as to render the statute unconstitutional."); *Mercado-Boneta v. Administracion del Fondo de Compensacion al Paciete Through Ins. Com'r of Puerto Rico*, 125 F.3d 9, 13 (1st Cir. 1997) (finding no Contract Clause violation and noting that insurance companies operate

38

"in a heavily regulated context"); *Allstate Ins. Co. v. Kim*, 376 Md. 276, 300, 829 A.2d 611, 625 (2003)("the contract at issue is an insurance policy which, like the industry as a whole, is subject to extensive regulation by the State"); *Serrano v. Aetna Ins. Co.*, 233 Conn. 437, 453, 664 A.2d 279, 287 (1995)(no Contract Clause violation given "the highly regulated nature of the insurance industry").

In this matter, BCBS has operated since 1995 under the explicit statutory obligation to have a sufficient number of providers in network to "assure reasonable access to care with minimum inconvenience by plan enrollees." Miss. Code. Ann. § 83-41-409(b)(the "Patient Protection Act of 1995"). The Contract Clause does not exempt BCBS from this longstanding condition of its certificate to sell insurance in Mississippi. BCBS, having accepted a certificate to sell insurance, must abide by the State's requirements.

Finally, even assuming the impairment of an existing BCBS contractual obligation, the impairment is not unconstitutional if it is "reasonable and necessary to serve an important public purpose." *Energy Reserves Group, Inc.*, 459 U.S. at 411. In order to survive this minimal judicial scrutiny, the State action must "impose [ ] a generally applicable rule of conduct designed to advance 'a broad societal interest.'" *Exxon Corp. v. Edgerton*, 462 U.S. 176, 191 (1983). The State's purpose of protecting the citizens' access to care and its regulation of insurance industry are unquestionably legitimate public policy goals permissible under the Contract Clause. As the Michigan Supreme Court concluded in case involving BCBS's challenge to other state insurance regulations, a state has "both a significant and legitimate" interest in "ensuring all subscribers reasonable access to, and reasonable cost and quality of, health care services. The promotion of the health and

general welfare of citizens is a matter of unquestionable state concern." *Blue Cross & Blue Shield of Michigan v. Milliken*, 367 N.W.2d 1, 21-22 (1985).[14]

**Conclusion**

The request for a temporary restraining order should be denied.

**RESPECTFULLY SUBMITTED**, this 24th day of October, 2013

PHIL BRYANT, GOVERNOR OF
THE STATE OF MISSISSIPPI


BY:  */s/ Harold E. Pizzetta, III*
    HAROLD E. PIZZETTA, III (MSB No. 99867)

Harold E. Pizzetta, III
Assistant Attorney General
Counsel for the State Defendants
Civil Litigation Division
Office of the Attorney General
Post Office Box 220
Jackson, Mississippi 39205
Telephone: (601) 359-5654
Email: hpizz@ago.state.ms.us

---

[14]To the extent that BCBS desires to challenge to correctness of the State's conclusion, or challenge whether the State's action will have the desired result, neither of those objections are considered relevant to the Contract Clause.  Because federal courts do not arbitrate policy disputes, the court need not agree that the State "will ultimately accomplish the goal . . . to provide better and less expensive health insurance to Kentucky residents."  *Golden Rule Ins. Co.*, 912 F. Supp. at 268.

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document has been filed electronically with the

Clerk of Court and thereby served on the following persons:

R. David Kaufman, Esq.
Cheri D. Green, Esq.
Brunini, Grantham, Grower & Hewes, PLLC
Post Office Drawer 119
Jackson, Mississippi 39205

This the 24th day of October, 2013.


/s/ Harold E. Pizzetta, III
Harold E. Pizzetta, III